## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SANYA KAY MILNER,**

      **Plaintiff,**

      **v.**

**KILOLO KIJAKAZI, Acting**
**Commissioner of Social Security,**

      **Defendant.**

                           **Civ. No. 20-1016 KK**

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Sanya Kay Milner's Motion to Reverse and Remand Administrative Agency Decision, filed September 7, 2021.[2] (Doc. 27). The Acting Commissioner of the Social Security Administration ("Commissioner") filed a Response, and Ms. Milner filed a Reply. (Docs. 33, 34.) Having meticulously reviewed the entire record and relevant law, and being otherwise fully advised, the Court finds that Ms. Milner's Motion is well-taken and should be GRANTED.

### I.  BACKGROUND AND PROCEDURAL HISTORY

Ms. Milner brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking reversal of the Commissioner's decision denying her claims for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434 and 1381–1383f. (Doc. 1; Doc. 27 at 1.)

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 12.)

[2] Ms. Milner filed a memorandum in support concurrently with the motion. (Doc. 28.)

## A.  Procedural History

On March 21, 2012, Ms. Milner filed claims for DIB and SSI alleging disability beginning March 6, 2012. (AR 221–34, 12.)[3] These claims were denied initially and on reconsideration. (AR 121–29, 132–36.) Ms. Milner requested a hearing before an Administrative Law Judge ("ALJ"), which was held on January 13, 2015. (AR 28–53, 138.) On February 25, 2015, the ALJ issued an unfavorable decision, denying her claims. (AR 12–20.) Ms. Milner appealed the ALJ's decision to the Appeals Council, which denied her request for review, making it the Commissioner's final decision. (AR 1–4.) On October 13, 2016, Ms. Milner appealed the final decision in federal court, and on January 18, 2018, the Court reversed the Commissioner's decision and remanded the case for further review. (AR 1050–51, 1052–89.) In accordance with the district court's opinion, the Appeals Council vacated the final decision and remanded Ms. Milner's case for reconsideration. (AR 1093.)

On September 26, 2019, a new ALJ[4] held a hearing at which Ms. Milner and a vocational expert ("VE") testified. (AR 986–1024.) The VE testified as to Ms. Milner's previous employment and provided an analysis of that previous work. (AR 1020–21.) But before formulating a hypothetical, the ALJ ended her questions for the VE. (AR 1021–22.) The ALJ explained:

> There's 1,700 plus pages in this record. So, before I try to formulate a hypothetical, I want a chance to go through this, especially the older records. The, the current records I think are pretty, pretty clear. It's the, the older period going back to the 2012. So, what I'm going to do is, at this point, is I don't have questions for [the VE]. I may or may not have questions for her down the road either by interrogatory or by supplemental hearing.

---

[3] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on July 6, 2021. (Doc. 24.)

[4] Unless otherwise specified, all discussion herein refers to the ALJ who heard Ms. Milner's case on remand.

(AR 1022.) The ALJ informed Ms. Milner's counsel that she "may be in touch with [his] office potentially about onsets or about interrogatories" and closed the hearing. (AR 1023.)

On December 16, 2019, the ALJ contacted Ms. Milner's counsel and asked if Ms. Milner would "consider amending the alleged onset date of disability to February 1, 2017." (AR 906; Doc. 28 at 4.) By letter dated January 9, 2020, counsel informed the ALJ that Ms. Milner was "not opposed to amending the onset to September 1, 2015[.]" (AR 1231.) Ms. Milner's counsel noted his understanding that if they could not "reach an agreement as to onset, then a supplemental hearing will be scheduled." (AR 1231.) No agreement was reached and a supplemental hearing was scheduled for June 16, 2020. (AR 1187.)

On February 13, 2020, the ALJ requested that a different VE[5] appear at the supplemental hearing than the VE who had appeared at the September 26, 2019, hearing. (AR 1212–13; *see also* AR 986.) By letter dated April 23, 2020, Ms. Milner objected to the new VE, asserting that "[t]here is no foundation for this witness to testify, as he does not have the requisite knowledge, skill, experience, training, or education as a vocational expert." (AR 1293.)

On June 16, 2020, the ALJ held a supplemental hearing at which Ms. Milner and the new VE testified. (AR 938–84.) Ms. Milner's counsel conducted voir dire on the VE and the ALJ questioned him as to his qualifications; the ALJ found the VE qualified to testify as an expert. (AR 959–70.) The VE then answered the ALJ's hypothetical questions, and Ms. Milner's counsel cross-examined him. (AR 970–82.) After testimony had been taken, counsel requested time to research the jobs to which the VE testified and asked for leave to file a post-hearing brief to respond to the VE's testimony. (AR 983.) The ALJ responded: "Okay, well I'll tell you what. I'll give you seven

---

[5] Unless otherwise specified, all discussion herein refers to the second VE.

days. I'm not gonna give you more than that. This case has been dragging on too long as it is."
(*Id.*)

On June 22, 2020, Ms. Milner timely submitted her post-hearing brief, in which she again
challenged the VE's qualifications and argued that the VE's "testimony as to existing occupations
is inaccurate, unconvincing, and unbelievable[.]" (AR 1318–29.) On July 30, 2020, the ALJ issued
an unfavorable decision. (AR 907–26.) The Appeals Council declined to assume jurisdiction over
the case, making the ALJ's decision the Commissioner's final decision. *See Hamlin v. Barnhart*,
365 F.3d 1208, 1214 (10th Cir. 2004); 20 C.F.R. §§ 404.984, 416.1484. Ms. Milner now appeals.

## B. The ALJ's Written Decision

In her July 30, 2020, decision, the ALJ applied the Commissioner's five-step sequential
evaluation process.[6] (AR 906–26.) At step one, the ALJ determined that Ms. Milner has not
engaged in substantial gainful activity since her alleged onset date of March 6, 2012. (AR 909.)
At step two, the ALJ found that Ms. Milner suffers from the severe impairments of "osteoarthritis
of the right ankle, status post surgical repair; chronic obstructive pulmonary disease; asthma;
degenerative disc disease of the lumbar spine with no evidence of severe stenosis; obesity;

---

[6] The five-step sequential evaluation process requires the ALJ to determine whether:

    (1)     the claimant engaged in substantial gainful activity during the alleged period of disability;
    (2)     the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement;
    (3)     any such impairment meets or equals the severity of a listed impairment described in Appendix 1 of 20 C.F.R. Part 404, Subpart P;
    (4)     the claimant can return to his past relevant work; and, if not,
    (5)     the claimant is able to perform other work in the national economy, considering his residual functional capacity, age, education, and work experience.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

depression; anxiety; and posttraumatic stress disorder[.]" (*Id.*) The ALJ also determined that Ms.

Milner suffers from the non-severe impairments of "headaches, cervical degenerative disc disease,

marijuana abuse, hypothyroidism, complex regional pain syndrome of the right lower extremity,

cholelithiasis status post cholecystectomy, and a healed left distal radius fracture[.]" (*Id.*) At step

three, the ALJ found that Ms. Milner's impairments do not meet or medically equal the severity

of one of the Listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (AR 909–12.)

> At step four,[7] the ALJ found that Ms. Milner has the residual functional capacity ("RFC")
>
> to perform a limited range of sedentary work . . . except the claimant is able to lift, carry, push, and pull up to ten pounds on an occasional basis, sit for at least six hours in an eight-hour workday, and stand and walk for two hours in an eight-hour workday. She can occasionally climb stairs and ramps, balance, stoop, crouch, and kneel. She can never crawl, and can never climb ladders, ropes, or scaffolds. She must avoid more than occasional exposure to extreme cold. She must avoid more than occasional exposure to pulmonary irritants such as fumes, odors, heavy concentration of dust, gasses, and poor ventilation. She is able to understand, remember, and carry out simple instructions with a reasoning level of no more than 2. She is able to maintain attention and concentration to perform and persist at simple tasks for two hours at a time without requiring redirection to task. She can have occasional contact with the general public and superficial interactions with co-workers and supervisors. She requires work involving no more than occasional change in the routine work setting.

(AR 912.) The ALJ also found that Ms. Milner "is on oxygen now, but can use a portable oxygen

concentrator that does not interfere with her ability to work." (AR 921.) Based on this RFC, the

ALJ determined that Ms. Milner is unable to perform her past relevant work as a

---

[7] Step four involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine what is "the most [the claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is the claimant's residual functional capacity. *Id.* Second, the ALJ must determine the physical and mental demands of the claimant's past work. *Winfrey*, 92 F.3d at 1023. Third, the ALJ must determine whether the claimant is capable of meeting those demands given his residual functional capacity. *Id.* A claimant who can perform his past relevant work is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f).

cashier/cook/stocker, home health aide, telemarketer, and customer service representative. (AR 924.)

At step five, the ALJ found that, "considering [Ms. Milner's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform." (*Id.*) In making this determination, the ALJ relied on the VE's testimony that an individual of Ms. Milner's age, education, work experience, and RFC could "perform the requirements of representative occupations" of addresser, tube operator, stuffer, table worker, and hand bander. (AR 925.) The ALJ thus concluded that Ms. Milner "has not been under a disability, as defined in the Social Security Act, from March 6, 2012, through the date of this decision[.]" (*Id.*)

In her written decision, the ALJ discussed Ms. Milner's objections to the VE's qualifications but did not discuss any of Ms. Milner's objections to the substance of the VE's testimony. (*Id.*)

## II.  STANDARD OF REVIEW

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. §§ 405(g); 1383(c)(3); *Hamlin*, 365 F.3d at 1214. In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).

The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record. "Substantial evidence is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (citations and quotation marks omitted). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118 (citations and quotation marks omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (citations, quotation marks, and alterations omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting his [or her] decision, the ALJ also must discuss the uncontroverted evidence he [or she] chooses not to rely upon, as well as significantly probative evidence he [or she] rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out his [or her] specific findings and his [or her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

## III. DISCUSSION

Ms. Milner argues that the VE's testimony does not meet the substantial evidence standard, and therefore it "was [an] error for the ALJ to rely on this vocational witness's testimony." (Doc. 28 at 22.) Specifically, Ms. Milner asserts that the VE's "knowledge of job numbers comes from

repeating figures, publications and a computer program," and that "[h]e is unable to articulate the methodology for the numbers of jobs in these publications." (Doc. 34 at 9.) The Court finds that the VE's testimony was deficient as to the methodology that he and his sources used to estimate job numbers and fails to meet the substantial evidence standard. As such, the ALJ erred in relying on it, and remand is warranted.

In her written decision, the ALJ noted the VE's testimony that a hypothetical individual of Ms. Milner's age, education, and RFC

> would be able to perform the requirements of representative occupations, all sedentary exertional level, SVP 2 jobs, such as: addresser, D.O.T. No. 209.587-010, of which approximately 25,000 such jobs exist in the national economy; tube operator, D.O.T. No. 239.687-014, 23,000; stuffer, D.O.T. No. 731.685-014, 5,000 nationally; table worker, D.O.T. No. 739.687-182, 5,000 nationally; hand bander, D.O.T. No. 920.687-030, 11,000 nationally; escort vehicle driver, D.O.T. No. 919.663-022, 23,000 nationally; and touch up screener, D.O.T. No. 726.684-110, 5,000 nationally. [The VE] further testified use of portable oxygen tank would eliminate escort vehicle driver.

(AR 925.) "Based on the testimony of the vocational expert," the ALJ concluded that Ms. Milner is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id.*)

At the supplemental hearing, the ALJ questioned the VE as to his knowledge of job numbers in the national economy:

> Q . . . [D]o you have current knowledge of the existence and numbers of jobs at all exertional levels in the national economy?
>
> A Yes, Your Honor.
>
> Q And, how do you have that knowledge?
>
> A From, there's basically two national organizations that provide job numbers. And, that would be SkillTran and U.S. Publishing, and I subscribe to both of those both of those, [sic] as well as keeping abreast of what the Department of Labor through the Census Bureau [sic].

(AR 969.)

After the VE testified regarding the jobs that a hypothetical individual of Ms. Milner's age, education, and RFC could perform, Ms. Milner's counsel cross-examined the VE about his job number estimations as follows:

Q . . . So, where did you get these numbers from?

A These numbers come from US Publishing, SkillTran, County Business Patterns, and the Census Bureau.

Q So, it's, these numbers are from, did you, did you average them out or how did you, do, how did you come up with these specific numbers?

A Not exactly an average, I more or less just make sure there's not something that's, like an outlier, or just doesn't look right. So, I just use numbers that at least resemble each other.

(AR 976.) Ms. Milner's counsel then questioned the VE about his sources:

Q [W]hich [of your sources] are computer programs?

A SkillTran has a computer program called Job Browser Pro. . . .

. . .

Q Any of the other references that you testified to**,** are they computer programs as well?

A No, US Publishing is a spreadsheet, County Business Patterns and the Census Bureau is a website.

Q Okay. Now, as I understand these numbers that you've come up with are based upon these publications or the one computer program rather than your own personal surveys, correct?

A Correct, I can't survey the entire country.

Q Okay. And so, what you're doing is, you're repeating what somebody else says as far as the numbers involved in many particular occupations, correct?

A I'm sorry, say that, say that again.

Q You are repeating what somebody else has researched or come up with rather than your own surveys?

A Correct.

Q Okay. So, you're repeating what you've either read or you've seen on a computer screen, correct?

A Well, again, I cannot survey the entire country. I don't have that capability. I'm just a single person.

(AR 977–78.) Finally, Ms. Milner's counsel asked about the methodology the VE's sources use:

Q Okay. So, what's the methodology of each of these publications or the computer program used? How did they come up with these numbers?

A Oh, good Lord, my understanding is they have surveys that they send out to employers nationwide to, to get their numbers.

Q And do you have any information as to who they survey or how much is being surveyed?

A I don't know that, no.

(AR 978.)

In her post-hearing briefing, Ms. Milner argued that the VE's testimony showed that "[h]is knowledge of job numbers comes from repeating figures [from] publications and a computer program" and that "[h]e is unable to articulate the methodology for the numbers of jobs in these publications." (AR 1319.) In her written decision, the ALJ noted that the VE "has current knowledge of the existence and numbers of jobs at all exertional levels in the national economy from two national organizations that provide job numbers, SkillTran and US Publisher. He subscribes to both of these." (AR 925.) However, the ALJ did not discuss Ms. Milner's specific objections to the VE's job number testimony.

### A.  VE testimony as to the number of jobs in the national economy must be supported by some indicia of reliability

The Supreme Court has instructed courts to employ a case-by-case analysis in determining whether a VE's testimony is sufficient to meet the substantial evidence standard. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019) ("The inquiry, as is usually true in determining the substantiality of evidence, is case-by-case."). The threshold for the substantial evidence standard

"is not high," and "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1154 (citations and quotation marks omitted). Nevertheless, the Supreme Court has suggested that a VE's findings should rest on "a well-accepted methodology," and that, when questioned, a VE should be able answer questions "cogently and thoroughly." *Id.* at 1155. Also, a VE's conclusion must be supported by "sufficient indicia of reliability." *Id.* at 1157.

Likewise, the Tenth Circuit has noted that remand would be necessary if a VE relied solely on an unidentified document to support his testimony. *See Rogers v. Astrue*, 312 F. App'x 138, 141–42 (10th Cir. 2009); *see also Pedone v. Berryhill*, No. 16-cv-02767, 2018 WL 460063, at *8 (D. Colo. Jan. 18, 2018) (cleaned up) ("Without any testimony or evidence that the VE could endorse the [job numbers] data, based on his own knowledge or expertise, the VE's testimony was unreliable and the ALJ's conclusions in reliance on this testimony were thus not supported by substantial evidence."). And, though not binding on this Court, the Seventh Circuit has held that "where, as here, the claimant challenges the job-number estimate," the VE is required to "offer a reasoned and principled explanation of the method he used to produce it. And the explanation must be sufficient to instill some confidence that the estimate was not conjured out of whole cloth." *Brace v. Saul*, 970 F.3d 818, 822 (7th Cir. 2020) (citations and quotation marks omitted).

**B.  The VE's testimony as to his sources' methodologies is insufficient to support his job number estimates**

At the supplemental hearing, the VE testified that his job numbers came from "U.S. Publishing, SkillTran, County Business Patterns, and the Census Bureau." (AR 976.) When asked about the methodology his sources use, he testified to his "understanding" that "they have surveys that they send out to employers nationwide to, to get their numbers." (AR 978.) As an initial matter,

the Court notes that this answer is factually incorrect, as none of the VE's sources directly survey employers. The data used by the VE's sources are as follows:

- U.S. Publishing uses data published by the Bureau of Labor Statistics and the Census Bureau. *See U.S. Publishing, Data Source Reference*, https://www.uspublishing.net/references.html (last visited Apr. 12, 2022).

- SkillTran uses data published by the Bureau of Labor Statistics and the Census Bureau. *See Government Data Sources Used in SkillTran Products*, https://skilltran.com/index.php/support-area/documentation/261-data-sources (last visited Apr. 12, 2022).

- The Census Bureau gathers data through the American Community Survey, which is sent to households and not employers. *See About the American Community Survey*, https://www.census.gov/programs-surveys/acs/about.html (last visited Apr. 12, 2022).

- County Business Patterns uses data from the Census Bureau and "a variety of administrative record and survey sources," including tax data collected by the IRS. *County Business Patterns (CBP) Methodology*, https://www.census.gov/programs-surveys/cbp/technical-documentation/methodology.html (last visited Apr. 12, 2022).

Additionally, the VE's answer wholly failed to address a fundamental difficulty in estimating numbers for occupations, like those at issue here, defined by Dictionary of Occupational Titles ("DOT") codes. Under the relevant regulations, the Commissioner takes administrative notice of the DOT, *see* 20 C.F.R. § 416.966(d)(1), which defines jobs including their functional requirements. And indeed, having a source for the functional requirements of jobs is important, especially in cases like this one, where the ALJ found that Ms. Milner is only able to perform a limited range of sedentary work. (AR 912.) But the DOT "just *defines* jobs. It does not report how many such jobs are available in the economy." *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443,

446 (2d Cir. 2012) (emphasis in original). And the data the government publishes—*i.e.*, the data that all of the VE's sources use—is "at an aggregated group level, rather than by DOT occupation, which renders estimating the number of jobs available in the economy for a given DOT occupation no easy task."[8] *Purdy v. Berryhill*, 887 F.3d 7, 15 (1st Cir. 2018) (Souter, J., sitting by designation).

The VE's testimony does not show whether or how he accounted for this fundamental problem when he estimated job numbers for individual DOT jobs that he testified Ms. Milner could perform. In concluding that this renders his testimony insufficient to meet the substantial evidence standard, the Court has considered each of the VE's sources as follows.

  1.  *The Census Bureau*

The Census Bureau is a governmental data source, and as discussed above, it does not report numbers for individual DOT codes. Instead, it reports job numbers using Standard Occupational Classification ("SOC") codes, "a federal statistical standard used by federal agencies to classify workers into occupational categories for the purpose of collecting, calculating, or disseminating data." *Standard Occupational Classification*, https://www.bls.gov/soc/ (last visited Apr. 12, 2022). Under the SOC, "[a]ll workers are classified into one of 867 detailed occupations according to their occupational definition." *Id.* This is compared to over 12,700 DOT job codes.

---

[8] In addition to the First Circuit, the Second, Fourth, Seventh, and Eleventh Circuits have also recognized this fundamental problem. *See Brault*, 683 F.3d at 447 n.4 ("[A] many-to-one mapping, such as the one the VE used to associate DOT titles to [occupation category] codes, necessarily creates information loss."); *Chavez v. Berryhill*, 895 F.3d 962, 965 (7th Cir. 2018) ("The use of one system to supply the job titles and another to provide the number of jobs creates a matching problem: a one-to-one correlation does not exist."); *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1281 (11th Cir. 2020) (same); *Guiton v. Colvin*, 546 F. App'x 137, 145 (4th Cir. 2013) (Davis, J., concurring) (same); *see also Hill v. Colvin*, 807 F.3d 862, 869–70 (7th Cir. 2015) (Posner, J., concurring) ("I write separately only to focus attention on what seems to me a persistent, serious, and often ignored deficiency in opinions by the administrative law judges…. The deficiency concerns testimony by vocational experts … concerning the number and types of jobs that an applicant deemed not to be totally disabled could perform, and the evaluation of that testimony by administrative law judges…. [T]he only reliable statistics on number of jobs are census data of broad job categories, rather than data on the number of jobs in the narrower categories of jobs that the applicant for benefits could actually perform.").

*See Stevenson v. Apfel*, 170 F. Supp. 2d 713, 718 n.2 (W.D. Tex. 2000). Because of this substantial difference in granularity, an SOC code is often associated with several DOT codes.[9]

For example, the DOT job of "addresser" is one of eight codes that the Bureau of Labor Statistics has associated with the SOC code for "Word Processors and Typists." *See DOT Crosswalk Search Codes matching "209.587-010"*, https://www.onetonline.org/crosswalk/DOT?s=209.587-010 (last visited Apr. 12, 2022); *see also O\*NET-SOC 2019 Crosswalks*, https://www.onetcenter.org/crosswalks/dot/DOT_to_ONET_SOC.xlsx, (last visited Apr. 12, 2022). But because the Census Bureau only publishes the aggregate number of Word Processor and Typist jobs, and the DOT addresser job is only one of the many different Word Processor and Typist jobs, a VE must use some method to further break down the Census Bureau's numbers.

When questioned, the VE testified that he "just use[s] numbers" from his sources. (AR 976.) He did not discuss any method that he used to estimate specific DOT job numbers from the aggregate Census Bureau data. And when asked if he was "repeating" the numbers reported by his sources, he said: "Correct." (AR 977–78.) Unless the VE determined that Ms. Milner could perform all of the jobs in the SOC group associated with the DOT code at issue—and there is no indication in the record that he did—it was error for the VE to simply rely on the Census Bureau's numbers directly. *See Goode*, 966 F.3d at 1283 ("Our sister circuits have recognized that a vocational expert, after figuring out the total number of jobs in an SOC group, needs to take an additional step to approximate how many of those are the specific job or jobs that the claimant

_____

[9] Additionally, some DOT codes are linked to multiple SOC codes. For example, the DOT code for "Faculty Member, College or University" is associated with 33 different SOC codes, including "Business Teachers, Postsecondary," "Chemistry Teachers, Postsecondary," and "Physics Teachers, Postsecondary." *See DOT Crosswalk Search Codes matching "090.227-010,"* https://www.onetonline.org/crosswalk/DOT?s=090.227-010 (last accessed Apr. 12, 2022).

could perform."). And if the VE did employ some methodology to derive individual DOT job numbers from the aggregate SOC data, there is no mention of it in his testimony.

        2.   *County Business Patterns*

County Business Patterns is a report published by the Census Bureau which provides "subnational economic data by industry." *County Business Patterns, About this Program*, https://www.census.gov/programs-surveys/cbp/about.html (last visited Apr. 12, 2022). For a VE's purposes the County Business Patterns reports the number of employees for various industries. But reliance on this source presents the same issue as reliance on the Census Bureau data.

For example, a VE may determine that the DOT addresser job can be found in over two dozen industries such as "Direct Mail Advertising," "Credit Card Issuing," and "Consumer Lending." *See* U.S. Publishing, *137-Unskilled Sedinatry* [sic]*, D.O.T. job titles and their corresponding 6 digit N.A.I.C.S. Codes* at 2, https://www.uspublishing.net/sample/ dotxnaicspage.pdf (last visited Apr. 12, 2022). But the County Business Patterns will only report the total number of individuals employed in those industries; it does not break down industry employment by job. A VE therefore will still need some way to determine how many of the aggregate jobs reported in County Business Patterns are specifically for the DOT addresser job. As with the Census Bureau data, here, the VE did not sufficiently explain how he used County Business Patterns data.

        3.   *SkillTran's Job Browser Pro*

SkillTran is a private company that produces the Job Browser Pro software. *See Gardner v. Colvin*, No. 12-cv-7275, 2013 WL 781984, at *2 (C.D. Cal. Mar. 1, 2013).  The Tenth Circuit has noted that Job Browser Pro "is not among the examples listed in 20 C.F.R. § 404.1566(d) of data sources considered to provide reliable job information." *Anders v. Berryhill*, 688 F. App'x

514, 523 (10th Cir. 2017). But as the VE explained at the supplemental hearing, SkillTran is one of the "basically two national organizations that provide job numbers." (AR 969); *see also Purdy*, 887 F.3d at 14 ("SkillTRAN's software has been recognized by at least one district court to be widely relied upon by vocational experts in estimating the number of relevant jobs in the national economy."). Unlike the Census Bureau and County Business Patterns, which only report aggregate numbers, Job Browser Pro uses a proprietary methodology to estimate job numbers for individual DOT codes. *SkillTran, Industry Context Methodology*, https://skilltran.com/index.php/support-area/documentation/220-industry-context-method (last visited, Apr. 12, 2022).

SkillTran has made publicly available a technical paper explaining its methodology. *See SkillTRAN Process for Estimating Employment Numbers*, https://skilltran.com/pubs/DOTempnum_method.pdf (Oct. 11, 2020). Instead of relying on occupational category and industry data separately, SkillTran combines these data; for a given DOT code, it considers only the subset of SOC jobs that are within the industries associated with that DOT code.[10] *Id.* at 5–7. However, the number of jobs for an occupational category within a relevant industry is still often an aggregate number corresponding to multiple DOT codes. To estimate individual DOT job numbers, SkillTran uses the "equal distribution" assumption, which assumes that jobs are equally distributed across all the associated DOT codes.[11] *See id.* at 5 ("The unweighted number for the [occupation] group in that industry is equally divided by the total number of DOT occupations in that [occupation] group that are likely to be employed in that specific [] industry.")

---

[10] SkillTran uses a proprietary mapping between DOT codes and industry identifier codes. *SkillTRAN Process for Estimating Employment Numbers*, at 7.

[11] This is also called the "equal distribution method." As a simplified example, suppose the DOT addresser job is one of eight DOT job codes associated with the Word Processors and Typists SOC code. Equal distribution would estimate that one eighth of all the Word Processors and Typists jobs were for addressers.

16

Courts have noted that equal distribution rests on an "illogical assumption that all job titles within a particular DOT job group exist in equal numbers in the national economy." *Chavez*, 895 F.3d at 966; *see also id* at 969 (noting that equal distribution "lacks any empirical footing"). The use of an equal distribution method will obviously overcount rare jobs and undercount popular ones. Additionally, this approach assumes that all jobs reported for a given SOC code must correspond to associated DOT jobs, and not to any new jobs that may have come into existence since the DOT was last published in 1991. But as SkillTran explains, achieving a more accurate apportionment would require a bespoke distribution developed by "[a] skilled vocational expert or other subject matter expert with deep knowledge" of the specific industries.[12] *SkillTRAN Process for Estimating Employment Numbers*, at 6.

Moreover, SkillTran acknowledges the limitations of the DOT job number estimates that Job Browser Pro provides. SkillTran advises VEs to "[k]now your data sources, data collection methods, and their limitations," "[u]se multiple methods to shape your opinion," "[h]ave an opinion about specific methods," and "[c]ompare the results of any estimation method to your knowledge and experience of real labor markets." *Defending Your Use of Job Browser Pro Methodology*, https://skilltran.com/index.php/support-area/documentation/223-jbp-defense (last visited Apr. 12, 2022). SkillTran further advises VEs using its products to "**[i]nvest some time in learning how and why [Job Browser Pro] works the way it does**." *Id.* (emphasis in original). Based on the VE's testimony, he failed to follow these recommendations.

---

[12] SkillTran contends that "equal distribution at the industry level for an occupation … is completely different from equal distribution at the SOC[] level." *SkillTRAN Process for Estimating Employment Numbers*, at 5.

4. *U.S. Publishing*

U.S. Publishing is a private organization that sells quarterly publications providing "statistics on employment by occupation" derived from government data. *Welcome to U.S. Publishing Occupational Statistics Online*, https://www.uspublishing.net/ (last visited Apr. 12, 2022). U.S. Publishing sells two different employment reports, the *Occupational Employment Quarterly II* ("OEQ") and the *Specific Occupational Employment Unskilled Quarterly* ("SOEUQ"). *Id.* Because the VE did not specify which of these products he used, the Court will consider both.

The OEQ reports job numbers by SOC code. *See* https://www.uspublishing.net/ oeqiii_page.html (last visited Apr. 12, 2022); *see also Goode*, 966 F.3d at 1281. For each SOC code, the OEQ lists the number of jobs and the number of DOT codes associated with that SOC code. *See OEQ II Sample Page*, https://www.uspublishing.net/sample/OEQII3.0samplepage.pdf (last visited Apr. 6, 2022.) Additionally, for each SOC code, the OEQ provides estimates for the number of jobs at different skill levels and strength factors.[13] *Id.* Because the OEQ provides aggregate job numbers, a VE must use some method to determine how many of the jobs are for a specific DOT code. As discussed above, there is no indication that the VE did this.

---

[13] U.S. Publishing does not make publicly available the methodology it uses to estimate the number of SOC jobs at different skill levels. However, VEs in other cases have testified that the OEQ uses the equal distribution method for these estimates. *See, e.g.*, *Leisgang v. Kijakazi*, No. 21-cv-40, 2022 WL 970151, at *4 (W.D. Wis. Mar. 31, 2022) ("According to [the VE], the OEQ uses the 'equal distribution method' of estimating job numbers based upon the number of [DOT] codes contained within a particular job category. When asked by plaintiff's counsel whether he thought this was a reliable method of estimating national job numbers, [the VE] responded that it was 'the only method' available to him.").

The Seventh and Second Circuit have also concluded that U.S. Publishing uses equal distribution in the OEQ. *See Brault*, 683 F.3d at 447 n.4 (explaining that "if ten DOT codes correspond to one SOC code, and four of those codes are light-duty, unskilled positions, then the OEQ will list 40% of the positions available in that SOC as light-duty, unskilled positions."); *Ruenger v. Kijakazi*, 23 F.4th 760, 764 (7th Cir. 2022) (noting that the OEQ is "a publication that uses the [equal distribution] method to calculate its estimates").

The SOEUQ reports job number estimates, organized by DOT code, specifically for the 137 sedentary unskilled jobs listed in the DOT. *Specific Occupational Employment - Unskilled Quarterly*, https://www.uspublishing.net/soeuq.html (last visited Apr. 12, 2022). Like SkillTran, U.S. Publishing looks at both occupational category and industry job numbers to derive its DOT code estimates. *Id.* But unlike SkillTran, U.S. Publishing does not make available a publicly accessible explanation of its methodology. The only information U.S. Publishing provides is that SOEUQ "utilize[es] the [County Business Patterns] data in conjunction with our current methodology."[14] *Id.*

U.S. Publishing states that its "data is [sic] intended to be used in conjunction with local labor market expertise and research" because its data "are estimates and should be used accordingly." *U.S. Publishing Data Source Reference*, https://www.uspublishing.net/references.html (last visited Mar. 30, 2022.) According to U.S. Publishing, a VE should use "local knowledge of the labor market" and "[d]ata produced by local research should be given more weight then [sic] U.S. Publishing data estimates." *Id.* It is clear from the VE's testimony that he did not follow U.S. Publishing's recommendations.[15]

---

[14] One district court has noted that "it is not only possible, but highly likely that U.S. Publishing uses equal frequency distribution to estimate job numbers within a group." *Jones v. Saul*, No. 19-cv-494, 2021 WL 100357, at *3 (N.D. Ind. Jan. 12, 2021).

[15] The Court is also concerned about the lack of information U.S. Publishing makes publicly available regarding the methodology it uses. As another court in this district recently explained, "Tenth Circuit precedent emphasizes the importance of allowing the claimant to question the VE about [non-noticed] sources." *Balata v. Saul*, No. 19-cv-70 SCY, 2020 WL 3489543, at *12 (D.N.M. June 26, 2020) (citing *Gay v. Sullivan*, 986 F.2d 1336, 1340 (10th Cir. 1993)). Because U.S. Publishing's methods are a black box, claimants will likely be limited in their ability to properly question a VE about the use of U.S. Publishing products and the reliability of its estimates. This is particularly concerning in a case like this one, where the VE's testimony about his sources' methodologies was factually inaccurate.

**C.  The VE's testimony as to job numbers does not meet the substantial evidence standard**

As discussed above, the available data show numbers for aggregate jobs and not for individual DOT codes. Because of this, none of the VE's sources' numbers can necessarily be relied upon directly or without further analysis. Rather, a VE must make use of "past experience [with his sources' methodologies], knowledge of national or local job markets, or practical learning from assisting people with locating jobs throughout the region" in order "to offer an informed view on the reasonableness of his estimates." *Chavez*, 895 F.3d at 969; *see also Rogers*, 312 F. App'x at 142 ("The whole point of vocational testimony is to go beyond facts already established through publications eligible for judicial or administrative notice and provide an alternative avenue of proof."). In short, a VE must do more than report numbers from a source and must provide *expert* analysis.

Here, the VE was asked two specific questions about his job number estimates. He was asked about his sources' methodologies, to which he replied: "Oh, good Lord, my understanding is they have surveys that they send out to employers nationwide to, to get their numbers." (AR 978.) And he was asked how he used the different numbers his sources reported, to which he stated that he looked at the numbers and would "more or less just make sure there's not something that's, like an outlier, or just doesn't look right" so as to "just use numbers that at least resemble each other." (AR 976.)

Based on this testimony, no reasonable mind could accept the VE's job number estimates. His answer about his sources' methodologies was inaccurate; and, he failed to even acknowledge that, to the extent they estimate individual DOT job numbers at all, they do so from aggregate data. And his method of "us[ing] numbers that at least resemble each other" is wholly unsupported

where some of his sources report numbers for individual DOT codes and others report numbers for SOC codes.

The Court is further troubled by the Commissioner's reliance on the VE's testimony at step five when it considers the asserted 25,000 addresser jobs and 23,000 tube operator jobs, which together account for nearly 65% of the jobs the VE testified Ms. Milner could perform while using a portable oxygen machine. According to the DOT, an addresser, also called an "envelope addresser" or "addressing clerk," "[a]ddresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing." Addresser, DICOT 209.587-010, 1991 WL 671797. A tube operator, also called a "pneumatic-tube operator" or "tube-station attendant," "[r]eceives and routes messages through pneumatic-tube system: Opens incoming pneumatic-tube carriers containing items, such as mail correspondence, bills, and receipts. Reads and sorts items according to department. Inserts items into carriers, and carriers into tube system, and routes to specified locations." Tube Operator, DICOT 239.687-014, 1991 WL 672235. The DOT entries for these jobs have a listed "Date of Last Update" of 1977, which indicates that "the occupation has not been studied by an analyst since publication of the fourth edition DOT in 1977." *Dictionary of Occupational Titles, Appendix C*, https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOTAPPC (last visited Apr. 12, 2022); *cf.* Mark Trepani & Deborah Harkin, Soc. Sec. Admin., Occupational and Medical-Vocational Claims Review Study at 7 (May 2011) (identifying addresser and tube operator among other jobs that "[i]t is doubtful . . . currently exist in significant numbers in our economy.")

Due to the widespread adoption of personal computers, printers, and word processing software with mail merge features, there is substantially less need in the modern economy, as compared to the economy of the 1970s and earlier, for employees whose only responsibility is to

address items for mailing. Notably, other district courts have rejected VE testimony estimating significantly fewer national addresser jobs than the 25,000 such jobs the VE testified to in this case. *See e.g.*, *Tamara C. v. Saul*, No. 18-cv-118, 2020 WL 1276579, at *3 (D. Utah Mar. 17, 2020) (finding that because "[c]omputers and printers have largely replaced the use of typewriters and handwriting," a reasonable mind would not accept VE's testimony that there are 8,622 addresser jobs in the national economy); *Skinner v. Berryhill*, No. 17-cv-3795, 2018 WL 1631275, at *6 (C.D. Cal. Apr. 2, 2018) (finding that a reasonable mind would not accept VE's testimony that there are over 10,000 addresser jobs in the national economy); *Jason Robert F. v. Comm'r, Soc. Sec. Admin.*, No. 20-cv-201, 2021 WL 1010946, at *8 (D. Or. Mar. 16, 2021) (rejecting VE's testimony approximating 6000 addresser jobs in the national economy and collecting cases finding that the job of addresser does not exist in significant numbers).

Common sense would also suggest that with the advent of the internet and electronic mail there is substantially less need in this century for employees whose only job duty is to sort items and route them through a pneumatic tube mail system. Indeed, most industries have stopped using large-scale pneumatic tube systems,[16] and the Court questions whether a significant number of dedicated tube operator jobs exist in New Mexico or anywhere else in the national economy. *See, e.g.*, *Hawthorne v. Comm'r of Soc. Sec.*, No. 20-cv-2247, 2021 WL 4356009, at *2 (E.D.N.Y. Sept. 24, 2021) ("Some of the jobs suggested for [the claimant], most egregiously pneumatic tube operator, do not exist in the modern economy."); *Gary-Bailey v. Colvin*, No. 14-cv-1535, 2016 WL 1323106, at *4, n. 5 (D. Conn. Jan 13, 2016) ("The Court does indeed wonder where one

---

[16] The Court notes that although pneumatic tube systems in hospitals, modern pneumatic tube systems are computer controlled and do not require a dedicated employee to sort and route items. *See, e.g.*, Mark W. Isken & Steven J. Littig, *Simulation Analysis of Pneumatic Tube Systems*, 26 J. of Med. Sys. 9, 9–10 (2002) (discussing the use of modern computer-controlled pneumatic tube systems in hospitals).

might find a position as a tube operator or envelope addresser in 21st Century Connecticut."); *Tillman v. Astrue*, No. 08-cv-43, 2011 WL 3748816, at *9 (N.D. Fla. July 18, 2011) (VE testified that the job of tube operator had become "obsolete" and should be excluded). Since 1977, when the job descriptions for addresser and tube operator were last updated, technological advances have greatly changed employers' staffing needs, and on the record here, a reasonable mind could not accept the VE's testimony as adequate to support the conclusion that significant numbers of addresser and tube operator positions exist in the national economy.

The Supreme Court has stated that there must be some "indicia of reliability" supporting a VE's conclusions. *Biestek*, 139 S. Ct. at 1157. The VE's testimony here—which showed an erroneous understanding of his sources' methodologies and failed to demonstrate the application of expertise, experience, or individual research—lacks any indicia of reliability, and no reasonable mind could accept it as adequate to support his job number estimates. Because the ALJ's determination at step five was based solely on the VE's unreliable testimony, it is not supported by substantial evidence and remand is warranted.

## IV. CONCLUSION

For the reasons above, the Court determines that the VE's testimony as to the number of jobs in the national economy did not meet the standard of substantial evidence, and the ALJ erred in relying on the VE's testimony. Because of this error, the Commissioner failed to meet his burden at step five and remand is warranted.[17] Ms. Milner's Motion to Reverse and Remand

---

[17] Ms. Milner contends that the ALJ made other errors warranting reversal. (Doc. 28 at 19–27.) However, the Court will not address these claimed errors because they may be affected on remand. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

Administrative Agency Decision (Doc. 27) is GRANTED and this matter is remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

     IT IS SO ORDERED.

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE